| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | CASE NO. C15-4034-DEO |
| Stephanie Strubbe, Carmen Trader, and Richard Christie, | |
| And, Individually, | |
| Plaintiffs, | **PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO 31 U.S.C. §§ 3729-3732, FEDERAL FALSE CLAIMS ACT** |
| vs. | **JURY TRIAL DEMAND** |
| CRAWFORD COUNTY MEMORIAL HOSPITAL AND BILL BRUCE, INDIVIDUALLY, | |
| Defendants. | |

## PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO 31 U.S.C. §§ 3729-3732, FEDERAL FALSE CLAIMS ACT

The United States of America, by and through *qui tam* Relators, Stephanie Strubbe, Carmen Trader, and Richard Christie, brings this action under 31 U.S.C. §§ 3729-3732 (the "False Claims Act") to recover all damages, penalties and other remedies established by the False Claims Act on behalf of the United States and themselves and would show the following:

### PARTIES

1.      Relator Stephanie Strubbe ("Strubbe") is a citizen of the United States and a resident of Crawford County, Iowa.

2.      Relator Carmen Trader ("Trader") is a citizen of the United States and a resident of Shelby County, Iowa.

1

3.     Relator Richard Christie ("Christie") is a citizen of the United States and a resident of Crawford County, Iowa.

4.     Defendant Crawford County Memorial Hospital ("CCMH") is a county-owned non-profit hospital organized pursuant to the laws of the State of Iowa, and doing business in Crawford County, Iowa.

5.     Defendant Bill Bruce ("Bruce") is the Chief Executive Officer ("CEO") of CCMH, and is a resident of Crawford County, Iowa.

## JURISDICTION AND VENUE

6.     Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relators' claims seek remedies on behalf of the United States for multiple violations by Defendants of 31 U.S.C. § 3729 in the United States, most of which, upon information and belief, occurred in the Northern District of Iowa, and because, based upon information and belief, Defendants transact most of their business within the Northern District of Iowa.

## GENERAL BACKGROUND

7.     CCMH has been certified by Medicare as a "critical access hospital" ("CAH") pursuant and subject to 42 C.F.R. Part 485.

8.     Bruce was hired by CCMH in April of 2012 as CEO.

9.     Bruce was rewarded with a generous employment contract by CCMH which provided for, among other things, an annual base salary of $155,000.00, multi-year term, termination for cause only and if no cause, a generous severance package in the form of liquidated damages.

2

10.     Bruce's employment contract was amended in 2013 by addendum raising Bruce's salary in the second year of the contract to $180,866.40 and awarding him up to $72,346.56 in performance based bonuses. Upon information and belief the employment agreement has been amended since then.

11.     In 2014, upon information and belief, CCMH's Board of Directors and Bruce began discussions about their intention to sell the Old Hospital to a privately owned nursing home, Eventide Lutheran Home for the Aged, Missouri Synod ("Eventide").

12.     Eventide is an Iowa non-profit corporation, located in Denison, Iowa with 62 independent living units, 36 assisted living units, and a 100 bed skilled nursing facility.

13.     Eventide cares for more residents in a day than CCMH has patient beds.

14.     Since the beginning of Bruce's tenure as CEO, CCMH has experienced nearly 100% turnover of its staff, has had two Board members resign in protest over the management of the hospital, has suffered from multiple internal and external complaints regarding its management, and has restricted the flow of information to the public regarding hospital expenditures.

15.     Since the beginning of Bruce's tenure, CCMH has been depleting its cash reserves.

16.     Specifically, prior to Bruce's hiring, and upon information and belief, CCMH owned approximately $21 million worth of certificates of deposit.  Today, upon information and belief, the cash reserves in the form of certificates of deposit is approximately $6.5 million.

17.     Since Bruce's hiring, some CMMH policies and procedures regarding hospital finances, billing practices, and personnel practices have been changed.

3

18.     Bruce has interfered with the operation of the human resources function of CCMH by absconding with employee records, personnel files, EEO complaints, and other documents maintained in the ordinary course of human resources business.

19.     Since Bruce's hiring, requests for certain financial documents from the public and from employees were met with resistance from CCMH's administration and the Board. For example, requests for copies of credit card statements for Bruce's hospital credit card were no longer provided – instead only summaries of categories of expenditures are provided. Other detailed backup documentation requests were similarly denied or ignored. Also, since CCMH became aware of the initial complaint in this case, CCMH stopped providing complete financial information in the Board packets.

20.     Since Bruce's tenure began at CCMH, the gross income of CCMH has increased as reported by Bruce in Board packets, yet for unknown reasons, Bruce and the CCMH administration repeatedly inform employees that CCMH is losing money and is not profitable and cannot afford pay increases for most staff. Bruce, however, during time relevant to this matter, while decreasing other staff salaries, increased his own salary.

21.     Since Bruce's employment, employees, members of the public, and former Board members have requested information regarding specific questioned expenditures made by CCMH, but have not received any backup documentation justifying some of these expenditures.

## SPECIFIC AND DETAILED ALLEGATIONS

22.     Each of the named Relators was an employee of CCMH at the time this action was commenced.

23.     Relator Strubbe was an Emergency Medical Technician B, hired by CCMH on

4

March 4, 2014 and terminated without cause on March 7, 2016.

24.     Relator Trader is a paramedic, hired by CCMH on March 1, 2010.

25.     Relator Christie was a paramedic, hired by CCMH on November 9, 2007, and terminated without cause in May of 2015.

26.     Prior to Bruce's employment, employees of the emergency medical department, including Relators, were not required to perform breathing treatments for inpatients of the hospital and such procedures were routinely handled by nursing staff at CCMH.

27.     Beginning in November of 2014, the paramedics of the emergency medical department, including Trader and Christie, were required on nights and weekends to perform breathing treatments for inpatients of CCMH whenever a respiratory therapist was not onsite. The employees were informed, in writing, that this change in policy was for "billing purposes." The employees were also told by their supervisor that this change in policy was for "cost reimbursement" purposes.

28.     The paramedics performing the breathing treatments received no additional practical training and are not as qualified to provide breathing treatments as the Registered Nurses employed, on-staff, and working shifts at the hospital during times when the paramedics are called on to perform those treatments.

29.     The only training the paramedics received for inpatient breathing treatments at this time was how to chart the treatments so as to maximize billing.

30.     The paramedics were told by their managers, in writing, that no matter how long the breathing treatments took, to document on timesheets that the treatments took at least 30 minutes.  These timesheets are used in billing to Medicare.

5

31.     While the paramedics are giving the breathing treatments, they must leave the emergency room, so a nurse (who should be the one giving the breathing treatments) must then leave the floor to "cover" the emergency room for the paramedics while the paramedics go onto the floor to perform the breathing treatments.

32.     Upon information and belief, if the nurses provide the treatments, those treatments are included in the bills already submitted to Medicare (upon information and belief, under a "bundled" service pursuant to Medicare Part A), whereas if the paramedics provide the treatment, the nursing bills remain the same to Medicare, and CCMH is able to additionally and improperly bill for the paramedics' services for the treatments.

33.     Since the paramedics have been instructed to perform the breathing treatments, a higher percentage of the patient population has been receiving the breathing treatments. For example, in December of 2014, CCMH saw a 77% increase in the number of patients who received breathing treatment as compared to December of 2013.

34.     "Year to date" statistical analyses provided in Board Packets also show an increase – as much as 53.46% as of September 2015.

35.     Even though the total number of breathing treatments drastically increased in a comparison between December of 2013 and December of 2014, total hospital admissions decreased. Total admissions to CCMH in December 2013 was 78 and 187 breathing treatments were performed. Total admissions in December of 2014 was 74 and 331 breathing treatments were performed.

36.     Upon information and belief, because CCMH is now billing separately for the breathing treatments, more breathing treatments are ordered per patient, and more patients are

6

ordered to receive breathing treatments.

37.     Upon information and belief, patients are receiving breathing treatments who do not require such treatments, for example, Patient A, known to Relator Trader, was ordered to receive breathing treatments despite having been in a traumatic, clearly terminal, accident.

38.     Relators Christie and Trader have questioned nurses on the staff regarding the provision of breathing treatments to patients who clearly do not need the treatments, but they were told to give the treatments anyway.

39.     The practice of having the paramedics provide the breathing treatments results in more bills to Medicare than would otherwise have been sent to Medicare for the treatments than if the nurses were simply allowed to perform them.

40.      CCMH treats all "non-nurse" staff, such as paramedics, as "specialized staff" claiming that makes respiratory therapy services provided by them "separate billable ancillary services under the inpatient hospital benefit" when they otherwise wouldn't be separately billable.

41.     CCMH has been billing respiratory therapist services provided to inpatients as separately billable ancillary services under the inpatient hospital benefit.

42.     Respiratory therapy is not an "inpatient therapy" which is allowable to be billed as a separately billable ancillary service under the inpatient hospital benefit, like physical therapy, occupational therapy or speech language pathology.  *See* Medicare Benefit Policy Manual Chapter 14, sections 220 and 230.

43.     A critical access hospital cannot bill inpatient respiratory therapy separately, only outpatient can bill the services separately.   See:  http://www.hcpro.com/ content.cfm?dp=

7

HIM&content_id=247625&publication=8160& See also: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/Inpatient_Rehab_Fact_Sheet_ICN905643.pdf .

44.     Inpatient respiratory therapy also cannot be billed separately or additionally under Medicare Part B.

45.     CCMH not only bills inpatient respiratory therapy services more when a respiratory therapist performs the treatment, CCMH also bills inpatient respiratory therapy services separately and more when a paramedic performed the services.

46.     Paramedics are not specially trained staff warranting separate ancillary billing for inpatient respiratory therapy services.

47.      Inpatient care is paid under reasonable cost methods and rehabilitation inpatient services are "reimbursed based on billed charges or set rates."

https://www.hnfs.com/content/hnfs/home/tn/prov/claims/CAH_Reimbursement.html

48.     Respiratory therapy is not a "rehabilitation inpatient services".

49.     Billing respiratory therapy as a "rehabilitation inpatient service" takes the charges out of the regular inpatient care and improperly increases how much payments increase from Medicare. http://www.hcpro.com/content/234447.pdf

50.     Medicare allows that "pulmonary rehabilitation" can be billed separately if it is done outpatient. See https://www.medicare.gov/coverage/pulmonary-rehab-program.html. New rules maybe imply that these can be billed to Medicare part B under some circumstances, see https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-Sheets/2013-Fact-Sheets-Items/2013-03-13.html.

8

51.     CCMH has been imposing the requirements for outpatient pulmonary rehabilitation on the paramedics, specifically requiring that they document 30 minute sessions regardless of whether or not the treatment took that long.  See:

http://www.hcpro.com/content.cfm?dp=HIM&content_id=247625&publication=8160& .

52.     The paramedics do not meet the rules of being properly trained staff to bill separate outpatient pulmonary rehabilitation services as ancillary staff, even if these services were being done on an outpatient basis.  *See*  http://physical-therapy.advanceweb.com/Article /Medicare-Regulations-Involving-Ancillary-Staff.aspx

53.     The regulations for proper outpatient pulmonary services ancillary billing also demonstrate that paramedics are not properly trained ancillary staff.  *See*  https://www.cms.gov/ Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf, at page 217.

54.     Prior to Bruce's employment, employees of the emergency medical department, including the EMTs and paramedics like Relators, were not required to perform blood draws for patients of the hospital who were at the hospital on a regular visit or admitted to the hospital.

55.     Beginning around July 2014, the EMTs and paramedics, including Plaintiffs, were required to perform laboratory work, including drawing blood ("phlebotomy") from patients.

56.     Upon information and belief, if the laboratory employees of CCMH performed the blood draws, rather than the EMTs or paramedics, only Medicare part A would be billed as part of a bundled service.  If the EMTs or paramedics perform the blood draws, then Medicare is billed for added services in addition to the bundled service for which the patient has already been billed.

57.     Upon information and belief, the reason EMTs and paramedics are now required

9

to perform this service is so that CCMH can submit additional, unnecessary and improper bills to Medicare that CCMH would not be able to submit if the blood draws were performed by nurses or laboratory personnel at CCMH. This results in Medicare paying more for services than allowed under *The Hospital Manual*, or Medicare's regulations.

58.     CCMH also misclassifies members of the emergency medical department, reporting to Medicare that the employees providing the services are more qualified than their qualifications and licensing suggest.

59.     For example, Jonathon Richard ("Richard") was employed by CCMH and given the title of "Paramedic." Richard performed all of the services of a paramedic, such as starting IVs, breathing treatments, giving medication, and pushing narcotics. Upon information and belief, Richard's services were billed, in part, to Medicare. Richard was not, however, licensed in the State of Iowa as a paramedic.

60.     On January 29, 2015, Relators Christie and Trader reported this violation involving Richard to the Iowa Department of Public Health.

61.     Another CCMH employee, Zachary Rasmussen, ("Rasmussen") was listed as a "phlebotomist" on schedules and internal CCMH paperwork. Rasmussen is not an EMT, nor a paramedic, and upon information and belief, has not been trained in phlebotomy. Instead, Rasmussen is a CPR certified driver who failed the test needed to become an EMT.

62.     Upon information and belief, CCMH bills Rasmussen as a phlebotomist, despite not being a certified phlebotomist.

63.     Realtor Strubbe is an EMT B. Her training in phlebotomy has been to watch another employee perform the task. She has no outside training, or certification, in phlebotomy.

Yet, Strubbe, upon information and belief, is billed to Medicare for her blood draws as if she is a certified and trained phlebotomist.

64.     EMTs and paramedics, including each of the named Relators, are also required to go to Eventide to draw blood for Eventide patients despite the fact that Eventide employs staff, including nurses, capable of providing such services.  Upon information and belief, this arrangement allows for Eventide to bill their daily bundled rates for their services to Medicare, while also allowing CCMH to bill Medicare for services as if the Eventide residents were "outpatients" of CCMH.

65.     CCMH has entered into a similar arrangement with Denison Care Center, a nursing home, which employs staff capable of performing the services now provided by the CCMH ambulance staff.  Until a few months ago Denison Care Center employees performed the services now provided by CCMH ambulance staff.  Upon information and belief, this arrangement allows for extra, improper billing to Medicare by CCMH that would not otherwise have occurred.

66.     Since Bruce's employment at CCMH, EMT or paramedic staff are now required to be personally present in the emergency room during shifts when before EMT or paramedic staff were not required to be at the emergency room during their shifts.  Upon information and belief, this change in policy was solely to allow for increased billings to Medicare.

67.     During this time, as CCMH was increasing its number of breathing treatments, and increasing its number of blood draws, CCMH was also paying its doctors by RVUs, which include a mathematical calculation of services provided to determine physician pay structure. Upon information and belief, this method of calculation of pay resulted in increased pay to the

11

physicians providing services to CCMH.

68.     Since Bruce's employment at CCMH, various individual expenditures have been reported in Board packets, but requests for detailed information about the expenditures have been ignored, frustrated, or avoided by Bruce and the Board.  Upon information and belief, these expenditures were not made for legitimate CCMH business and were otherwise inflated.

69.     For example, review of CCMH hospital expenditures provided to the Board show both payments to credit card companies were reported, as well as the underlying items paid by the credit card, duplicating the total amount of payments than were actually made by CCMH.

70.     In addition, review of CCMH credit card expenditures show a payment to "Money Gram" in Brooklyn Center, Minnesota on January 9, 2014 for $917.04 and a fee of $45.86.  When supporting documentation was requested of CCMH initially under an open records request, the information came back that CCMH was "unable to locate receipts for the following amounts: $839.79, $917.04, $45.86."  However, a subsequently provided receipt shows a clearly altered document that was originally for $117.04 that had been changed to be $917.04 for "Gas & Moving Expenses" for Sherry Morreau.

71.     Ms. Morreau had been hired as the Health Information Management ("HIM") manager for CCMH and was moving from Wisconsin, not Minnesota, to Denison, Iowa.

72.     It would not be normal business practice to send cash by MoneyGram from a credit card for any hospital purpose, much less to a future employee who had not yet started their job at CCMH for advance moving expenses that had not yet been incurred.

73.     Upon information and belief this MoneyGram payment was not actually for moving expenses for Ms. Morreau as reported.

12

74.     Certain vendors paid by the hospital are personally related to Bruce and their services are paid well above market value.  For example, thousands of dollars have been paid to Bruce's brother, who, upon information and belief, owns an out-of-state moving company.  This out-of-state moving company is paid from CCMH funds to move doctors and other staff to Denison when it would be more economical to use a local moving company for such work.

75.     Upon information and belief, these expenditures, as well as other expenditures, were made by CCMH for expenses which are not actually hospital expenses, or which are improper hospital expenses, but yet were included in cost reports submitted to Medicare.

76.     Because CCMH is a CAH, CCMH receives federal funds as a result of all reported expenditures.

## STATUTORY VIOLATIONS

77.      Medicare requires that a CPT code be assigned to services to receive reimbursement.  Sometimes, these services are required to be "bundled," rather than submitted for each separate service.  *The Hospital Manual* published by the Center for Medicare and Medicaid Services ("CMS") provides guidance on which services should be bundled.  The services that are required to be bundled include laboratory services and nursing services for inpatients.  *See The Hospital Manual, Chapt. 3, section 10.4 and 10.5.*

78.     Medicare requires that proper credentials be reported in reimbursement claims because the amount of the reimbursement is based on the credentials of the service provider.  Generally, such reimbursement is from the Medicare Part B program, which subsidizes a portion of the costs of certain medical treatments if the person who is providing the service is qualified. 42 C.F.R. Ch. IV, Subch. B.

13

79. The Medicare Rural Hospital Flexibility Program ("Flex Program"), created by Congress in 1997, allows small hospitals to be licensed as Critical Access Hospitals ("CAH") and offers grants to states to help implement initiatives to strengthen the rural health care infrastructure. CAHs must be located in a rural area and be more than 35 miles from another hospital (15 miles by secondary roads or in mountain terrain) or have been certified before January 1, 2006 by the state as being a necessary provider of health care services. Additionally, to be considered a CAH, the hospital must have an emergency room that operates 24 hours a day and 7 days a week using either on-site or on-call staff. A CAH is normally limited to 25 inpatient beds used for either inpatient or swing bed services. CAHs are also subject to a 96-hour (4-day) limit on the average length of stay. *See,* http://www.healthit.gov/providers-professionals/benefits-critical-access-hospitals-and-other-small-rural-hospitals, last accessed 4/20/15.

80. In order to be designated, and maintain, a "critical access hospital" designation, CCMH must follow the rules promulgated in 42 CFR part 485. This includes 42 CFR § 485.608(d), which requires that Staff of the critical access hospital are all licensed, certified, or registered in accordance with applicable Federal, State, and local laws and regulations.

81. 42 CFR 409.10 sets forth certain included services for critical access hospital inpatients:

(a) Subject to the conditions, limitations, and exceptions set forth in this subpart, the term "inpatient hospital or inpatient CAH services" means the following services furnished to an inpatient of a participating hospital or of a participating CAH or, in the case of emergency services or services in foreign hospitals, to an inpatient of a qualified hospital:
(1) Bed and board.
(2) Nursing services and other related services.
(3) Use of hospital or CAH facilities.
(4) Medical social services.
(5) Drugs, biologicals, supplies, appliances, and equipment.

14

(**6**) Certain other diagnostic or therapeutic services.
(**7**) Medical or surgical services provided by certain interns or residents-in-training.
(**8**) Transportation services, including transport by ambulance.

82. Most expenses at a critical access hospital are reimbursed to the hospital by Medicare at 101% of the costs reported on a cost report. Some services can be reimbursed at a higher rate than 101%. In effect, all expenses of CCMH affect how much money it receives from Medicare. *See* *http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/CritAccessHospfctsht.pdf*, last accessed 4/20/15.

83. Payment for outpatient Critical Access Hospital services may also be reimbursed at the 101% level, or, if the hospital elects, under the Optional Payment Method, which is based on the sum of: (1) For facility services – 101 percent of reasonable costs, after applicable deductions, regardless of whether the physician or practitioner reassigned his or her billing rights to the CAH; (2) For physician professional services – 115 percent of the allowable amount, after applicable deductions, under the Medicare PFS; and (3) For non-physician practitioner professional services – 115 percent of the amount that otherwise would be paid for the practitioner's professional services, after applicable deductions, under the Medicare PFS.

84. Additional payment rules for Critical Access Hospitals may be found at Sections 1814(a)(8), 1814(l), 1820, 1834(g), 1834(l)(8), 1883(a)(3), and 1861(v)(1)(A) of the Social Security Act (the Act) and 42 CFR 410.152(k), 412.3, 424.15, 413.70, and 413.114(a).

85. The Anti-Kickback Statute, 42 USC §1320a-7b(b), prohibits offering, paying, soliciting, or receiving anything of value to induce or reward referrals or generate Federal health care program business, like Medicare or Medicaid.

## INTENTIONAL CONDUCT

86.     Any intentional misconduct and reckless disregard of the incidents identified by Plaintiffs demonstrate Bruce and CCMH's conscious intention to deceive the government, improperly increasing billing to Medicare, and improperly increasing expenditures by CCMH, resulting in financial harm to the federal government.

## FALSE CLAIMS ACT

87.     This is an action to recover damages and civil penalties on behalf of the United States and Relators arising from the false statements and claims made by Defendants in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729-3732.  In addition, it arises from the Defendant's violations of 42 U.S.C. § 1320a-7b(b), the Anti-Kickback Statute, as well as violations of the Medicare administrative rules.

88.     For conduct occurring on or after May 20, 2009, the FCA provides that any person who:

    a.      knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

    b.      knowingly makes, uses, or causes to be made or used, a false record or statement material to get a false or fraudulent claim paid;

    c.      conspires to defraud the Government by committing a violation of the FCA;

    d.      knowingly makes, uses, or causes to be made or used, a false record or statement to conceal material to an obligation to pay or transmit money or property to the Government,

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.

16

89.     The Act allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730. Relators claim entitlement to a portion of any recovery obtained by the United States as *qui tam* Relator/Plaintiff.

90.     There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relators are original sources as defined therein.  Relators have direct and independent knowledge of the information on which the allegations are based.   As required pursuant to 31 U.S.C. §§ 3730(b) and (e), Relators have voluntarily provided information, oral and/or written, and have sent a disclosure statement of all material evidence, information and documents related to this Complaint, both before and after filing, to the Attorney General of the United States and the United States Attorney for the Northern District of Iowa.

91.     Based on these provisions, Plaintiffs on behalf of the United States Government seek through this action to recover damages and civil penalties arising from the Defendants' submission of false claims for payment or approval. In this case, such false claims were submitted to Medicare as bills for services provided to patients, and on cost reports submitted to Medicare pursuant to CCMH's status as a Critical Access Hospital.  *Qui tam* Relators/Plaintiffs believe the United States has suffered significant damages as a result of the Defendant's false claims, and will continue to suffer significant damage.

## CAUSES OF ACTION

### Count I: False Claims (31 U.S.C. § 3729(a))

92.     *Qui tam* Relators/Plaintiffs reallege and hereby incorporate by reference each and every allegation contained in paragraphs 1 through 91 of this Complaint.

93.     Upon information and belief, the following claims made to Medicare were false claims:

a.     the claims made for the paramedic services at CCMH for breathing treatments which were both unnecessary and/or in violation of the bundling rules of Medicare;

b.     the claims made to Medicare for the paramedic and EMT services at CCMH for laboratory work in violation of the bundling rules of Medicare;

c.     the claims made to Medicare listing false credentials of the service providers, including claims made for Richard's work as a "paramedic," Rasmussen's work as a "phlebotomist" and claims for Strubbe's work as a "phlebotomist."

d.     the claims made to Medicare for the EMT and paramedic services provided to Eventide and Denison Care Center;

e.     the cost reports made to Medicare which include improper reimbursement and payments to vendors that were not actually for CCMH expenses; and

94.     Accordingly, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1).

95.     The United States Government paid the false and/or fraudulent claims.

96.      By virtue of the false or fraudulent claims Defendants presented or caused to be presented, the United States Government has suffered substantial monetary damages.

18

**Count II:  False Records or Statements (31 U.S.C. § 3729(a))**

97.      *Qui tam* Relators reallege and hereby incorporate by reference each and every allegation contained in paragraphs 1 through 96 of this Complaint.

98.      Defendants knowingly made or used false records or statements (a) to get false or fraudulent claims paid or approved by the Government, or (b) material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a). The false records or statements include:

a.      time and medical records made for "30 minute" breathing treatments that were not actually 30 minutes;

b.      time and medical records for breathing treatments being provided by "specialized ancillary staff" when, in fact, the paramedics performing the breathing treatments were not "specialized ancillary staff" under the applicable Medicare rules.

c.      reimbursement requests, invoices, and payments for improper payments to the vendors that were not for CCMH business or were for expenses not actually incurred by CCMH;

d.      documents listing Richard as a "paramedic," Rasmussen as a "phlebotomist" and Plaintiff Strubbe as a "phlebotomist;"

e.      cost reports submitted to Medicare listing false "costs" of CCMH; and

99.      By virtue of the false records or statements Defendants made or used, the United States Government has suffered substantial monetary damages.

**Count III: Conspiracy (31 U.S.C. § 3729(a))**

100.      *Qui tam* Relators reallege and hereby incorporate by reference each and every allegation contained in paragraphs 1 through 99 of this Complaint.

101.      Defendants conspired with Eventide, LLC to violate the Anti-Kickback Statute,

19

in violation of 31 U.S.C. § 3729(a).

102.     By virtue of the false or fraudulent claims submitted, paid, or approved as a result of Defendant's conspiracy to defraud the Government, the United States has suffered substantial monetary damages.

**COUNT IV:  Retaliation Against Stephanie Strubbe**

103.     *Qui tam* Relators reallege and hereby incorporate by reference each and every allegation contained in paragraphs 1 through 102 of this Complaint.

104.     Strubbe first started participating in protected activity in July of 2014, including reviewing Board packets and questioning whether something was not right with the finances of CCMH.

105.     In September of 2014, Strubbe went to several CCMH Board members, including, Carol Swanson, Virgie Dieber-Henningsen, Greg Kuehl, and Kevin Fineran, and spoke to all Board members about the financial situation of CCMH, her belief that the finances were not adding up, asked why the public could not get CCMH and Bruce's credit card statements, and about other concerns that she had about the management of CCMH.

106.     In the Board meeting in September of 2014, the Board addressed Strubbe's concerns, and announced there was going to be an investigation into some Strubbe's allegations. A newspaper article reported these actions.

107.     Tom Eller, chairperson of the Board, announced at this Board meeting that an outside person should do the investigation of Strubbe's allegations.

108.     Two days after the Board meeting, Strubbe received phone call from Greg Kuehl, apologizing and said that there was not going to be an investigation and the Board was going to

20

give Bruce a "clean slate."

109.     Strubbe met with the Crawford County sheriff in September 2014 about her concerns with financial mishandling of CCMH funds.  Other individuals within the hospital also met with the Crawford County sheriff at the same time.

110.     At about this same time frame, CCMH Board members Carol Swanson and Virgie Dieber-Henningsen stepped down from their role as Board members at CCMH.

111.     Bruce Musgrave, Relators' supervisor, reported to Relators that Bill Bruce had potentially been misusing the credit card.

112.     Kurt Wilkins, CCMH's prior human resources manager, reported to Relators that Bill Bruce had potentially been misusing the credit card.

113.     On November 24, 2014, Strubbe injured her back and right shoulder on the job at CCMH.  She was assigned light duty and in the lab in December of 2014.  Later, she was transferred to work at HIM, then to work in the storage room and then to do supplies.

114.     Strubbe was diagnosed with a torn rotator cuff.  Her doctor said Strubbe should no lifting.

115.     By mid-June 2015 Strubbe was told that CCMH had no more light duty work for her.

116.     In July of 2015 Strubbe received a letter that her injury and light duty assignments were creating a financial hardship on CCMH, and therefore she was demoted to casual part time, losing her benefits effective August 1st.

117.     In August of 2015, Strubbe was specifically told that she was not going to be fired as a result of her injury, and that once doctor released her for full time duty, she would be

placed back in her original position prior to the injury.

118.    In November of 2015 CCMH received official notification that Strubbe was a plaintiff in the instant action.

119.    On January 21, 2016, Strubbe had her second surgery and was expected to make a full recovery to be able to go back to work.

120.    On March 4, 2016, Defendants terminated Stephanie Strubbe in writing.

121.    The only reason given to Strubbe for the termination was because she had not worked in more than six months.

122.    In between August of 2015 when Strubbe was explicitly told she would not be fired and March 4, 2016 when Strubbe was fired, Strubbe had not even been doing any employment duties for CCMH.  Thus, the only change in between those two dates was the fact that CCMH and Bruce became aware that Strubbe had filed this instant action.

123.    Upon information and belief, the real reason Strubbe was demoted, and eventually terminated, was because of her engaging in protected activities in investigating, and filing, the instant case.

124.    CCMH also called the State licensing authorities to try to get Strubbe's license suspended or revoked, thinking Strubbe would not call and self-report her injury, but she had, in fact, self-reported the injury.

125.    CCMH has not historically reported employees to the State licensing authorities when they were injured.

126.    Strubbe's license was not suspended or revoked, despite CCMH's attempts to have the license impacted.

127.   Other employees of CCMH who had a workers' compensation issue from an injury at work had their jobs reserved for them by CCMH and were specifically told they could maintain their jobs because they were not "problematic" employees.

128.   Strubbe, however, was a "problematic" employee because she sought to investigate, and report, activities at CCMH that she believed violated federal law.

129.   Strubbe requested her personnel file, and was told that CCMH had "lost" her personnel file.

130.   CCMH and Bruce's actions violated 31 U.S.C. § 3730(h), which prohibits retaliation against Strubbe for her activities.

131.   As a result of CCMH and Bruce's actions in violating 31 U.S.C. §3730(h), Strubbe has suffered emotional distress.

132.   Strubbe is entitled to:

> reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C.A. § 3730(h)(2).

**COUNT V:   Retaliation Against Richard Christie**

133.   *Qui tam* Relators reallege and hereby incorporate by reference each and every allegation contained in paragraphs 1 through 131 of this Complaint.

134.   Christie began investigating potential financial mismanagement in the hospital in mid-2014.  Specifically, Christie sent a request to CCMH employee Paula Cole, requesting a copy of all employee salaries in the last year or two.  Approximately ten minutes after sending the request, Christie received an email back from Bill Bruce stating that Bruce needed to have a

23

meeting with Christie.

135.    Bruce came to the emergency room to tell Christie that it would cost Christie about $100 to get a copy of the salaries.

136.    In November of 2014, Christie started complaining to nurses and employees that there was something wrong with the changes in the breathing treatments, and that he believed there was potentially something wrong with the financial statements provided by CCMH to the Board.

137.    By November 2014, it was common knowledge that Christie was investigating the hospital, and Christie was specifically told by Jess Emsweiler, the nurse manager, that she had heard he was investigating CCMH.

138.    On December 29, 2014, Jonathan Richard started his employment with CCMH.

139.    In January of 2015, Tim Zink showed Jonathan's licensure to Christie.

140.    Specifically on January 28, 2015 Christie discovered for sure that Jonathan Richard was not properly licensed.  Christie immediately sent a text photo to Bruce Musgrave, Christie's supervisor, notifying him that Jonathan Richard was not properly licensed.

141.    Christie also notified Strubbe, Trader, and, Trish DeLong of the licensing problem.

142.    Christie confronted Jonathan Richard and asked he had a State of Iowa paramedic card.  He did not have it.

143.    Christie told Jonathan Richard not to touch another patient until he was properly licensed.

144.    Bruce Musgrave, however told Jonathan Richard the next day at 6:00 a.m. to "tell

24

no one," just get a card, and that will take care of the whole problem.

145.    On January 29, 2015, Jonathan Richard told Strubbe and Christie that Musgrave told him push it under rug.  Jonathan Richard went to State Department of Health to get a card.

146.    On January 29, 2015, Christie called Steve Mercer, with IDPH Bureau of EMS, and reported to him about Jonathan Richard not being properly licensed.  Christie was required to tell IDPH otherwise he himself could lose his licensure.

147.    Christie was informed by Mercer that IDPH would investigate the matter and requested Christie, and anyone who had supervised Jonathan Richard, to send an email detailing the matter.

148.    Pursuant to Mercer's request, Christie called DeLong & Trader, informing them they must send an email immediately to Mercer.  These emails were sent January 29, 2015.

149.    An email was also sent by Christie to Heather Rasmussen, compliance manager, and Bill Bruce informing them that he had made the report about Jonathan Richard as required by Iowa law.

150.    As a result of this matter, Bill Bruce immediately threatened to fire Christie, DeLong and Trader.

151.    On February 5, 2015, a meeting was scheduled with Jonathan Richard and Strubbe to discuss the matter with Bill Bruce.  When Bill Bruce was informed that Strubbe intended to record the meeting, it was rescheduled for week later.

152.    The following week, the meeting occurred between Bruce, Paula Cole, Trader, Jonathan Richard, and Strubbe.

153.    At the time, Bill Bruce was acting Human Resources director, having fired Kurt

25

Wilkins. As such, it was Bill Bruce's job to check Jonathan Richard's licensure before his first day of work.

154. During this time, upon information and belief, Bill Bruce called Rick Eilander and told him that he was going to fire all three individuals who had reported CCMH to the State, specifically Christie, Trader, and DeLong.

155. Upon information and belief, within the electronic patient care report software used by CCMH, either Bill Bruce or Bruce Musgrave had entered Jonathan Richard's basic EMT number but changed his title to paramedic.

156. As such, upon information and belief, Jonathan Richard's services were knowingly and intentionally billed to Medicare as a "paramedic" despite Richard not being a licensed paramedic in the State of Iowa. During this time, Jonathan Richard performed paramedic duties, including breathing treatments, provision of medication, and tending to emergency room patients.

157. An investigation by the State of Iowa ensued.

158. By early May, Musgrave and Bruce conspired to have Christie fired.

159. On May 5, 2015, Musgrave alleged that Christie had referred to a patient as "fat." Christie had injured his back and called to request extra lifting help for the patient. Trader was present for the ambulance run.

160. On May 6, 2015, Bruce Musgrave wrote an official complaint, alleging that Christie had called the patient "fat."

161. On May 14, 2015, Trader was interviewed about whether called Christie had called a patient fat and she informed them that Christie had not called a patient fat.

26

162.     In May, Bill Bruce spoke with Chief of Police John Emsweiler, who in turn spoke with both police officers who had been present at the ambulance call. Both officers denied hearing anything where Christie had called anyone fat.

163.     Despite these interviews, on May 17, 2015, Christie was first notified that in the first week of June 2015, he was being switched to day shift, resulting in a pay cut.

164.     On May 19, 2015, Christie was paged, and again called in for an investigation. Strubbe was present as Christie's union representative.

165.     On May 20, 2015, CCMH and Jonathan Richard got cited by the State for violations of the State's licensing rules.

166.     On May 27, 2015, Musgrave and Bruce continued to try to get Christie fired, this time for "speeding" while in an ambulance, at 2:00 in morning, on the way to a call for a time-sensitive medical emergency.

167.     Christie and Trader responded to the emergency and saved the patient's life.

168.     The ambulance had a governor installed on it, preventing it from reaching excessive speed.

169.     Iowa law allows ambulances to exceed the speed limits.

170.     On May 28, 2015, Christie was terminated from CCMH.

171.     In June of 2015, after terminating Christie, CCMH sent in a packet to try to get Christie's paramedic license revoked by the State of Iowa, which included the allegations calling a patient "fat" and for speeding in an ambulance on the way to a call.

172.     Ironically, CCMH had never sent in any reports to the State for its use of unlicensed employees (only Christie had), but CCMH did send in these reports to the State.

27

173. Christie's license was not suspended or revoked by the State, despite CCMH's attempts to do so.

174. CCMH and Bruce's actions violated 31 U.S.C. § 3730(h), which prohibits retaliation against Christie for his activities.

175. As a result of CCMH and Bruce's actions in violating 31 U.S.C. §3730(h), Christie has suffered emotional distress.

176. Christie is entitled to:

> reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C.A. § 3730(h)(2).

## COUNT VI:  Retaliation Against Carmen Trader

177. *Qui tam* Relators reallege and hereby incorporate by reference each and every allegation contained in paragraphs 1 through 176 of this Complaint.

178. In 2014, Relator Trader also began investigating financial matters at CCMH, a fact widely known at CCMH.

179. Trader complained to nurses about the inappropriate use of breathing treatments on patients beginning in late 2014.

180. In January of 2015, Trader reported Jonathan Richard details to the State of Iowa as detailed above.

181. Trader was demoted in February of 2015 to days from nights.  This was a reduction in pay.  Upon information and belief, this demotion was done as retaliation for the actions in investigating this action and reporting the Jonathan Richard matter to the State.

28

182.     As such, upon information and belief, CCMH, Bill Bruce, and Bruce Musgrave began conspiring to retaliate against Trader for her protected activities.

183.     On July 7, 2015, while responding to a car accident, a volunteer nurse from the Westside Volunteer Fire Department assisted Trader in treating a patient.  Trader had been told that he had a nurse exemption and so she allowed him to assist.  Due to a mistake on the part of the nurse, he did not actually yet have the exemption.

184.     On July 30, 2015, Trader received a letter from the State informing her that CCMH had reported her to the State licensing authorities because the nurse who had said he had a nurse exemption did not have the exemption.

185.     CCMH had sent this complaint to the State as a means to try to retaliate against Trader for engaging in protected activities investigating CCMH.

186.     On July 20, 2015, Trader asked for time off to go to a nephew's funeral, but was told in front of other employees that she had to provide a copy of the obituary before being allowed to take a day off for a funeral, implying she was lying about the funeral.

187.     This requirement of providing an obituary for a family funeral is not regular practice or a policy of the hospital.

188.     Trader gave CCMH Facebook posts, the obituary, and a packet to Brad Bonner in house counsel for CCMH on July 22, 2015.  Trader informed Bonner at that time that Trader believed CCMH was engaging in harassment and retaliation against Trader for engaging in protected activities.

189.     Trader has also continued to be the target of discrimination, harassment, and derogatory statements by CCMH management and Bruce.  New employees with less experience

29

than Trader have also been hired at a higher rate of pay than Trader receives.

190.    CCMH and Bruce's actions violated 31 U.S.C. § 3730(h), which prohibits retaliation against Trader for her activities.

191.    As a result of CCMH and Bruce's actions in violating 31 U.S.C. §3730(h), Trader has suffered emotional distress.

192.    Trader is entitled to:

> reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C.A. § 3730(h)(2).

## RELIEF

193.    On behalf of the United States Government, the Relators/Plaintiffs seek to receive monetary damages equal to three times that suffered by the United States Government. In addition, the Plaintiff seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

194.    The *qui tam* Relators/Plaintiffs seek to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

195.    The *qui tam* Relators/Plaintiffs seek to be reimbursed for all allowable damages for the retaliation against them in their employment, pursuant to 31 U.S.C. §3730(h), specifically including reinstatement with their prior seniority status, two times back pay, interest on back pay, emotional distress damages, litigation costs and attorney's fees.

196.    The *qui tam* Relators/Plaintiffs seek to be awarded all costs and expenses for this

30

action, including attorney's fees and court costs.

197.    The *qui tam* Relators/Plaintiffs seeks all other indirect and allowable damages.

## JURY DEMAND

198.    Relators, on behalf of themselves and the United States Government, by and through

their attorneys, and request a trial by jury of all issues herein.

## PRAYER

WHEREFORE, Plaintiffs pray that this Court enter judgment on behalf of the

Relators/Plaintiffs and against the Defendants for the following:

a.  Damages in the amount of three (3) time the actual damages suffered by the United States Government as a result of the Defendant's conduct;

b.  Civil penalties against the Defendants equal to $11,000 for each violation of 31 U.S.C.  § 3729;

c.  *Qui tam* Relatosr/Plaintiffs be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.  *Qui tam* Relators/Plaintiffs be awarded the maximum allowable under 31 U.S.C. §3730(h).

d. *Qui tam* Relators/Plaintiffs be awarded all costs and expenses of this litigation, including attorney's fees and costs of court;

f.  *Qui tam* Relators/Plaintiffs be awarded all other allowable damages;

g.  All other relief on behalf of the Relator/Plaintiff or the United States Government to which they may be entitled and that the Court deems just and proper.

31

Dated: June 6, 2016

UNITED STATES OF AMERICA *ex rel.*
**Stephanie Strubbe, Carmen Trader, and
Richard Christie,**

Respectfully submitted,

 /s/ Angela L. Campbell
Angela Campbell, AT0009086
Dickey and Campbell Law Firm, PLC
301 E. Walnut, Ste 1
Des Moines, Iowa 50309
Telephone: (515) 288-5008
Fax: (515) 288-5010
E-mail: angela@dickeycampbell.com


 /s/ Michael J. Carroll
Michael J. Carroll, AT0001311
Coppola, McConville, Coppola, Carroll,
Hockenberg & Scalise, P.C.
2100 Westown Parkway, Suite 210
West Des Moines, Iowa 50265
Telephone: (515) 453-1055
Facsimile: (515) 453-1059
E-mail: michael@csmclaw.com

Attorneys for Relators/Plaintiffs

32